Good morning. May it please the court. My name is Trent West and I represent Travis J. Hollenkamp, the defendant of L.E. in this matter. Travis urges this court to affirm the decision of the Bond County Circuit Court finding that there was no mutual mistake that occurred in this transaction and declaring the plaintiff's deeds null and void. The plaintiff cannot overcome the standard of review that is on this appeal, that being that this court must find that the trial court's decision was manifestly against the weight of the evidence based on the plaintiff's failure to prove their burden at trial, which was also a heavy burden in and of itself. They had to present evidence proving by clear and convincing evidence that a mutual mistake had occurred, that this mistake was common to the parties, and that there was actually a different agreement reached between the parties besides that evidence by the warranty deed to Travis himself. The plaintiffs also failed to provide sufficient proof that the reporting statute should be invoked to protect their acquit claim deeds. But in the event this court decides that the trial court's decision regarding mutual mistake should be overturned, this court should reverse the trial court's decision denying Travis' motion to file a leave for affirmative defense because that motion was brought to conform the pleadings to the proofs it was brought before judgment and it was supported by the evidence at trial. First I would like to address, once again, that standard of review. This court, in order to overturn the trial court's decision that there was no mutual mistake between the parties, that there was no different agreement in that warranty deed, the plaintiffs must have proved that this decision was against the manifest weight of the evidence. In order to prove that this decision was against the manifest weight of the evidence, they had to prove that the trial record clearly shows that there was a different result reached other than that reached by the trial court. And that different result is the proper reason. It doesn't matter if necessarily this court finds that, well, it might not have been the best decision or it could have gone either way. The record must clearly show that the trial court's decision was against the manifest weight of the evidence. And that cannot be shown in this case. Here we have a transaction between family members and a power of attorney and Mr. Helmkamp. Verlin Rowell being the power of attorney. And what the plaintiffs had to prove, they had to carry the high burden, which is the burden to reform a written instrument, that being a warranty deed. In order to meet that burden, they have to prove by strong, clear, and convincing evidence that there were, in fact, two elements that met the mutual mistake. One, that there actually was a mutual mistake. It wasn't a unilateral mistake made by one party or the other. It was a mistake that was common to both parties. The second is that there must have been a different agreement reached than that expressed by the warranty deed in this matter. And the evidence clearly shows, along with the trial record and our brief, that Travis's intent was to purchase all of the property of what's called Lot 4. It's Lot 4, second plot of the Lewis subdivision, but it's known throughout as Lot 4, and I will reference as Lot 4 in this appeal. Plaintiffs claim that his intent was to purchase only the middle section of Lot 4. But his intent was evidenced throughout the trial that he intended to purchase all of Lot 4. What this tract is, it's a lakefront property in Greenville, Illinois, on Governor Lake. Governor Bond, excuse me.  Plaintiffs are claiming that Travis only was going to purchase the 100 feet in the middle. He wasn't going to purchase the entire 300. But what does Travis do immediately upon purchasing this property? He goes and he clears the whole entire 300 feet of the shoreline in the middle of winter, immediately after he purchased it. Burl Moral testified himself that he witnessed him do this. He just thought, well, Travis is a nice guy, that that's probably why he's doing it. No, he was doing it because Travis intended to buy that 300 feet of shoreline. And to him, to his knowledge, and to his wife's knowledge, that was 300 feet of shoreline. This was further evidenced by an incident that was created in April or May to where the plaintiffs ended up doing landscaping on what Travis believed to be his yard. So Travis and his wife, shocked, don't know why they were doing this, goes and approaches him and says, why are you building on our yard? What is going on here? This is the first time that Travis or his wife or anyone in his family realized that Burl and Paula K. Moral were claiming 100 feet of his property as their own. This is the first time they were aware of this fact. And this was presented by multiple witnesses, including Travis and his wife himself. Further, Travis— Mr. West, you wouldn't have us look at subsequent events to determine mutual mistake, would you? I mean, isn't the focus the timing of when this transaction all occurred? Yes, Your Honor. It is when all this transaction occurred. And isn't it true that the contract originally entered into had a blank address? Yes, Your Honor. It was completely filled out. It said Greenville, Illinois was all it said. It lacked a legal description. It lacked an address. But the evidence clearly showed at trial, at the time that contract was entered into, that Travis's intent was to buy all of Block 4. What evidence was there in the record that showed that at the time of trial, pre-recording of the deeds? I couldn't find that. Pre-recording was the testimony that was presented. His testimony? Travis's testimony, his wife's testimony, his in-law's testimony, and also his—being his father-in-law, mother-in-law, brother-in-law, his girlfriend. There were five or six witnesses all present at this Christmas party where this contract was, in fact, executed. And plaintiffs claimed that we discussed at this party that this was only for the middle part of Block 4. He was not buying the entire—we discussed this at length. But all of Travis's testimony, five or six, said we were sitting right there. None of these discussions took place. Everybody was all excited about how Travis was purchasing our grandmother's property. He's purchasing Alberta's property. Alberta's property was all of Block 4. So there was overwhelming testimony about that fact. Another thing that goes to kind of that pre-trial evidence is that everything was always discussed amongst this family. This family discussed what the purchase price should be. This family discussed who should buy it, who should own it, how that should all work. But what wasn't discussed was the fact that the middle part was going to be sold to Travis and each side was going to be hacked off and given to Burl and Paul K. Merle and Gary and Bonner D. Lewis. And that goes to the fact that that was never discussed. Why discuss everything else in this family? And as you can see behind me, this is a family that is together, a family that discusses things and supports one another. None of that was done, evidencing Travis's intent. And that Travis had no idea that he was only purchasing the middle section of this property. It's my understanding, though, that he paid less than the fair market value, according to the record. He did. You are correct that he did pay less than fair market value, but this was also a family transaction. A transaction involving grandchildren that didn't quite have very much money. A situation involving grandmother needing money to be supported in this affidavit. And I had some trouble with the testimony, which is why I'm picking on you. I apologize. That's fine. The title company was not brought into this litigation, I noticed. They were not. And yet this Lepker woman testified that she did know there was a discussion going on about dividing the land. Do you recall that in the record? Yes, Your Honor. I believe she, her knowledge was solely that maybe at some point in the future, based on what Burrell was telling her, that there may be a property division at some point in the future. Is what she continues to testify to. Not an actual division of the property before execution of the warranty deed. Or that in and of itself. What bothers me about the fact scenario is we have a claim that two warranty deeds were delivered to a title company on February 5th, right? The morning of February 5th, Burrell Morrell claimed he gave the quick land deeds to... Quick land deeds. And gave them to a real estate company, who then, the real estate woman indicates she knew about a discussion about dividing that up. Right? She claims she knew about a discussion about dividing it up, but yet... And yet, the deed with the wrong address, if you take the plaintiff's position, I'm not saying I am. But the deed with the full description of Lot 4 is printed out, typed in by the same title company. The woman who allegedly has knowledge, so... I believe the deed was drafted prior to this by an attorney in Edwardsville, Illinois. The deed was not in fact drafted by the title company. Did she testify? She did not testify, Your Honor. And I believe Ms. Locher and also the other real estate closer that was there stated that they did not see any deeds that day. They did not see any deeds but the warranty deed that was given to Travis. Was the title policy issued? Yes. On this property? Yes, Your Honor, the title policy was issued. So did the title policy reference the plat that had showed the sides lopped off? No, the title policy solely referenced Lot 4 in its entirety as it had been for the past 20 or so years. So the title company never made reference to this revised plat that had been... No, they did not, Your Honor. They did not bring that up and did not reference it at all. Thank you. To move on to the second element of what I believe is a proven mutual mistake is that there was some prior agreement that should have been entered into. But yet, they mistakenly entered into this agreement which doesn't actually reflect their true intention. And as this court stated in Paris v. City of Carbondale, Reformation is brought to try and reform the current writing that they have to conform it to a real estate... Sorry, to conform it to some other agreed upon contract. And although there was this real estate contract out there, there was no other contract where both parties were agreeing to only have the middle section of Lot 4 sold to Travis. At the time of the real estate contract and February 5th that morning when Travis received his warranty deed and when he recorded his warranty deed on February 8th, at all times, his intent was to purchase the middle section of Lot 4, not the middle section of Lot 4. Therefore, there was no other agreement. It did not prove mutual mistake by clear and convincing evidence. And there was an abundance of testimony otherwise. And the court focused heavily on this burden at trial that the court found both parties are reasonably credible. But the plaintiff supported their statement with very little corroborating evidence. There was little corroborating evidence of the fact that Berle-Merle intended to only sell the middle portion. And there was little corroborating evidence showing that he actually conveyed that intent to Travis or his wife or any other family members. One thing that I would note the plaintiffs also try and bring up to bolster their argument is the recording statute, which is often referred to as the race notice statute. Under this statute, all this shows is that Travis' warranty deed is superior to the quitclaim deed. It is undisputed that his warranty deed was recorded before the quitclaim deed. For some reason, the first quitclaim deed wasn't recorded until July 1st, 2010. And the second quitclaim deed wasn't recorded until October 19th of 2010. And he recorded his warranty deed on February 8th. That is unrebutted evidence, though. The only focus under this statute that plaintiffs could argue was the fact of notice. And as stated prior with Travis' intent and Berle's intent, Berle-Merle, who executed the warranty deed on behalf of the property owner, stating that we had these discussions. We talked about it. We talked at this Christmas party all about the fact that he was dividing this. But yet again, that testimony was continuously rebutted by almost every one of Travis' witnesses. So there was no actual notice. And the court was correct in its finding that there was insufficient proof of actual notice in order to carry the day, in order to carry this high burden that the plaintiffs had that day at trial. The other issues were of constructive notice. One argument that they stated, constructive notice, Berle said, well, I had these surveys conducted. So there were survey stakes out everywhere. There were 10 or 12 of them all over this property. They should have thought, hey, a survey stake. That means that I'm probably not getting all of Lot 4. He's not doing that just to measure the lot like some people do in a real estate transaction. These survey stakes put him on constructive notice. But that's clearly not the case. If you look at Plaintiff's Exhibit 5, the surveyor, Tim Robertson, who was not attached to either party in this case. He's a neutral individual. And his testimony benefited Travis. He stated, yes, there were survey stakes out there. But these survey stakes were on the boundary lines of this property. There were only maybe three survey stakes at the most on this entire tract of property that may have had survey stakes or may have been inside of the actual boundary lines. The survey stakes that were supposedly out there, which were not noticed by my client and were not noticed by my client's family who were continuously on this property. But if they did exist, they were on the boundary line, therefore not giving notice of any property provision and not giving notice of purchasing less. I believe they're referenced on the survey as possible circles with little dots inside of them to show where those survey stakes were. Further, Burl testified himself, so did the surveyor, so did Travis and his father-in-law, that there's a road leading back to this lot for him. And this road was being surveyed so Burl could have it taken over by the township. I'm not sure what the reasoning was if he was tired of taking care of it or caring for it. I believe it was his road. But he was trying to have it taken over, so he had this property surveyed. And they all testified that there were survey stakes out there because the road was being surveyed. They knew the road was being surveyed. So even if there was any kind of notice, it couldn't have been more than a bare suspicion that anything was going on due to the placement of the survey stakes and due to the survey of the road leading back to Lot 4, which goes by all the other lots. And further, they bring up the idea of the recorded surveys. They hit on, well, the surveys were recorded before the warranty was executed before it was recorded. Therefore, he should be put on constructive notice under the recording statute because the recording statute talks about recorded instruments, and surveys are allowed to be recorded. But that, in fact, is not the case. If you dissect the recording statute, it states that conveyances and instruments, upon recording, take no effect. Surveys take no effect. As the trial court correctly stated in this case. Well, it doesn't really matter if the property was divided up in a survey or a plat if the legal description on the warranty deed was for the full property anyway, right? Right. I mean, all it would give anybody notice of is that somebody filed something that showed various divisions, but then there's a warranty deed on file with a sale that sells all of Lot 4 as platted in 1983. Yes, Your Honor, you're correct. Not exactly. Travis's point at trial is that these surveys don't reflect any sort of interest. It didn't put him on notice that even if he would have sold them, oh, well, maybe I'm not receiving all of Lot 4. You look at the warranty deed, it covers all of Lot 4. Irma also said himself, and he kind of wiggled in his seat when he asked this question, is, well, did you read the warranty deed before you signed it? Well, his part of it is saying, well, yeah, I looked at it real quick, and then when Travis's trial counsel brought it up again, he said, well, I might not have looked at it until afterwards. So he is trying to claim this mistake, and this is a unilateral mistake. That's all it is. Vermeer made a mistake. We're not arguing he didn't intend to sell Lot 4, but that mistake doesn't grant him the ability to reform this warranty deed that covers all of Lot 4. So the recorded surveys, as well as the survey states, do not put him on notice. But if this court, and if this court affirms the trial court's decision, as it rightly should, regarding the mutual mistake argument, then Travis's motion to file leave for a determinative defense is moot. That decision does not need to be made based on affirmation of the mutual mistake argument, since if there's no mutual mistake, plaintiff's foot claim deeds are null and void. Therefore, they're not an issue. But if this court finds that there was actually a mutual mistake, this court should also reverse the trial court's decision denying the motion for leave to affirmative defense. And although the trial counsel is aware of the fact that this motion for leave to file affirmative defense was brought late and was brought after the trial, but before the judgment, the statute applicable, which is Section 5.4.2.6.16, states that motions for leave to amend pleadings, or amendments can be brought before or after there is a judgment to conform that pleading to the proofs. And that's what was occurring here. File a motion for leave to file affirmative defense to argue about a fraud presumption and to argue about the lack of donated intent in this instance based on the facts that were presented at trial, not facts that they knew of at the time of the original plea. What standing did he have to do that? What gave him standing to raise that affirmative claim? Standing for the affirmative defense is that if these foot claim deeds go forward and those foot claim deeds were valid, that impeaches on his interest. He is injured by these foot claim deeds on his interest. Didn't he want to allege a fiduciary breach? Wasn't that the basis of his claim? And that would be, and that's where the fraud argument goes to, is that fiduciary breach as a power of attorney entering into a transaction that benefits him is the fiduciary breach, and it is presumptively fraudulent. Do you think he had standing to do that? We do. We believe he had standing based on him being an injured party if these foot claim deeds proceed. I also noticed you claimed surprise as a part of that basis for asking for the affirmative defense. One of the surprises you claimed was the taking of an evidence deposition and admitting it at trial. Yes, Your Honor. Do you think that's a surprise when an evidence deposition is taken months in advance? The surprise came in at the fact that the evidence deposition was entered and that Alberta Louise Lewis was not actually going to be in court. We believe that she was going to be in court to be questioned. Anybody can enter an evidence deposition. That is correct, Your Honor. But we believe the facts coming together at trial and fitting in how they did with the power of attorney agreement, with all the contradictory statements that Ms. Louise Lewis stated in her deposition, that that arose and gave us grounds to bring that motion to leave and file an affirmative defense. So in summation, the trial court's determination that a mutual mistake occurred was not manifestly against the weight of the evidence. Plaintiffs failed to carry their burden on appeal and failed to carry their burden at trial because there was not a mutual mistake. There was a unilateral mistake. And the plaintiffs' bolstering of the recording statute and arguments on the recording statute are insufficient and only show that Travis's deed is, in fact, the superior deed. And for these reasons, Travis asked this court to affirm the decision of the trial court, finding that there was no mutual mistake. But if this court overturns that decision, Travis asked this court to reverse the denial of his motion to leave the defense and remand that decision back to the trial court. Thank you, Your Honor. Thank you, Mr. West, for your arguments and your briefs. And we'll take them in under a tied strip and a new rule in the new course. Thank you. Thank you.